**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **MIDWEST FAMILY MUTUAL<br>INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 16-cv-0437-MJR-DGW** |
| | ) | |
| **MERZ HEARING & AIR<br>CONDITIONING, INC., and<br>ROCK SOLID SURFACE<br>RESTORATION, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

**REAGAN, Chief Judge:**

### A.    Introduction

On August 30, 2015, a fire occurred in the duct system above a wood-burning stove/broiler/grill ("grill") in the kitchen of the Firefly Bar & Grill in Effingham, Illinois.  The fire resulted in significant damage to the restaurant and necessitated replacement of ductwork in the grill's exhaust system.

The Firefly, owned by Niall Campbell, made a claim under an insurance policy issued by Midwest Family Mutual Insurance Company.  Midwest paid its insured, the Firefly, $100,472.33 under the policy and then, as subrogee, filed this negligence action to pursue claims against two companies Midwest alleges are responsible for the fire – (1) Merz Heating and Air Conditioning, Inc., who designed and installed the ductwork over the grill at the Firefly, and (2) Rock Solid Surface Restoration, Inc., who cleaned and maintained the ductwork and exhaust system.

The Court enjoys subject matter jurisdiction under the federal diversity statute, 28 U.S.C. 1332. The first amended complaint (Doc. 12) indicates that Plaintiff Midwest is an Iowa citizen (incorporated and maintaining its principal place of business there), both Defendants are Illinois citizens (incorporated and maintaining a principal place of business there), and the amount in controversy suffices. The case is now before the Court on motions for summary judgment separately filed by Defendants on February 13, 2017 (Docs. 27-28). Midwest responded to both motions on March 21, 2017 (Docs. 35, 36). Merz and Rock Solid filed authorized reply briefs on April 3, 2017 and April 4, 2017, respectively (Docs. 39-40). For the reasons stated below, the Court denies Merz's motion and partially grants/partially denies Rock Solid's motion.

### B. <u>Overview of Key Allegations, Evidence, and Arguments</u>

According to Midwest, in 2005, Merz designed and installed the original ductwork used to carry exhaust from the wood-fired grill out of the Firefly. (In its answer, Merz denied that it designed the original ductwork; *see* Doc. 16, p. 2.) Following a fire at the Firefly in January 2011, Merz designed and installed *new* ductwork for the grill. This new ductwork contained several 90-degree angles to vent the exhaust from the grill. Shortly after the 2011 ductwork was installed, the owners of the Firefly hired Rock Solid to periodically clean various portions of the restaurant, including the ductwork on the grill. Rock Solid last cleaned the ductwork on July 28, 2015. Approximately one week later (on August 3, 2015), Rock Solid's owner (Barry Brown) installed an additional access panel on the ductwork.

On August 30, 2015, a fire started in the ductwork above the grill. The fire caused significant damage to the building, required the Firefly to cease operations for a period, and resulted in replacement of the ductwork. This current ductwork exits directly from the grill through the building and does not contain any 90-degree angled sections or bends.

In Count I of the amended complaint, Midwest alleges that Merz was negligent in failing to exercise reasonable care in the design, manufacture, and installation of the ductwork so as to prevent excessive build-up of flammable materials in the ductwork and ensure the ductwork would not ignite and expose the property to damage. More specifically, Midwest alleges that Merz failed to comply with design and industry standards and failed to install adequate access panels in the ductwork to allow it to be properly cleaned.

In Count II of the amended complaint, Midwest alleges that Rock Solid failed to exercise reasonable care in the cleaning and maintenance of the ductwork at the Firefly. More specifically, Midwest alleges that Rock Solid negligently maintained the ductwork and exhaust system, failed to timely notify the Firefly of any difficulties in cleaning the ductwork, failed to install adequate access panels in the ductwork to allow for proper cleaning, improperly installed an additional access panel in the ductwork, failed to comply with known industry standards, and failed to adequately inspect and supervise its employees' work on the system.

Seeking summary judgment, Merz contends that the testimony of Midwest's own expert "eliminates any genuine issue to be determined" by a trier of fact, as there is

no evidence of proximate cause between the actions of Merz (i.e., designing/ installing ductwork that had angles or bends and designing/installing ductwork with insufficient access points to facilitate cleaning) and the fire that damaged the Firefly in August 2015. Merz emphasizes that Midwest's own expert testified that an applicable safety standard (the "NFPA 96" standard for ventilation control and fire protection of commercial cooking operations) requires inspections for grease build-up every 30 days, that those inspections are the responsibility of the restaurant owner, and that inspections did not timely occur here in the lead-up to the subject fire.

In its motion for summary judgment, Rock Solid asserts that Midwest has produced no evidence to support the contention that Rock Solid was negligent in cleaning the ductwork system or that Rock Solid's installation of an extra access panel in any way caused or contributed to the loss. Rock Solid maintains that Midwest cannot meet its burden of proving that its damages were proximately caused by Rock Solid, because (1) the undisputed evidence establishes that the insured failed to have the ductwork cleaned in compliance with NFPA 96, and (2) Midwest offers only unfounded speculation that the ductwork was not sufficiently or properly cleaned by Rock Solid 33 days before the fire. Analysis starts with reference to the legal standards governing resolution of the pending motions.

### C.   Applicable Legal Standards

Because the undersigned exercises diversity jurisdiction in this action, state substantive law applies and federal procedural rules apply. ***See, e.g., Doermer v. Callen, 847 F.3d 522, 529 (7th Cir. 2017),*** *citing Goesel v. Boley Int'l (H.K.) Ltd.,* **806 F.3d 414, 419**

**(7th Cir. 2015), and** *Erie Railroad Co. v. Tompkins,* **304 U.S. 64 (1938).** *See also Great West Cas. Co. v. Robbins,* **833 F.3d 711, 715 (7th Cir. 2016).**

Federal courts deciding state law claims apply the forum state's choice of law rules to select the applicable state substantive law, and if no party has raised the choice-of-law issue, "the federal court may simply apply the forum state's substantive law." *Selective Ins. Co. of South Carolina v. Target Corp.,* **845 F.3d 263, 266 (7th Cir. 2016),** *quoting McCoy v. Iberdrola Renewables, Inc.,* **760 F.3d 674, 684 (7th Cir. 2014).** As Rock Solid points out (Doc. 28, p. 5), no one disputes that Illinois substantive law applies here.

To prevail on a negligence claim under Illinois law, the plaintiff must prove the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and an injury to plaintiff proximately caused by the breach. *Vesely v. Armslist LLC,* **762 F.3d 661, 664 (7th Cir. 2014),** *citing Buechel v. U.S.,* **746 F.3d 753, 763-64 (7th Cir. 2014), and** *Thompson v. Gordon,* **948 N.E.2d 39, 45 (Ill. 2011).** The existence of a duty is a question of law which the court must decide. *Id.* The issues of breach and proximate cause are questions of fact for the jury to decide, "provided there is a genuine issue of material fact regarding those issues." *Hollenbeck v. City of Tuscola,* **-- N.E.3d --, 2017 WL 977157 (Ill. App. March 13, 2017),** *quoting Espinoza v. Elgin, Joliet & Eastern Ry. Co.,* **649 N.E.2d 1323, 1326 (Ill. 1995).** *Accord Furry v. U.S.,* **712 F.3d 988, 992 (7th Cir. 2013) (usually breach and proximate cause are factual matters for the jury, but when "there is no material issue regarding the matter or only one conclusion is clearly evident," breach and proximate cause "become questions of law.").**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate where the admissible evidence shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. *Taylor-Novotny v. Health Alliance Medical Plans, Inc.,* **772 F.3d 478, 488 (7th Cir. 2014).** *Accord Archdiocese of Milwaukee v. Doe,* **743 F.3d 1101, 1105 (7th Cir. 2014),** *citing* **FED. R. CIV. P. 56.** A "material fact" is a fact that affects the outcome of the lawsuit, i.e., it is outcome-determinative under the applicable substantive law. *Taylor-Novotny,* **772 F.3d at 488;** *Hanover Ins. Co. v. Northern Bldg. Co.,* **751 F.3d 788, 791 (7th Cir.),** *cert. denied,* **135 S. Ct. 280 (2014).**

A genuine issue of material fact remains (and summary judgment should be denied), "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Miller v. Gonzalez,* **761 F.3d 822, 827 (7th Cir. 2014),** *quoting Anderson v. Liberty Lobby, Inc.,* **477 U.S. 242, 248 (1986).** However, if the factual record taken as a whole could *not* lead a reasonable jury to find for the non-moving party, there is nothing for the jury to do, and summary judgment is properly granted. *Bunn v. Khoury Enterpr., Inc.,* **753 F.3d 676, 682 (7th Cir. 2014),** *citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* **475 U.S. 574, 587 (1986).**

In assessing whether a genuine issue of material fact exists, this Court views the record in the light most favorable to the non-moving party. *Bunn,* **753 F.3d at 682.** *See also 520 South Michigan Ave. Associates, Ltd. v. Unite Here Local 1,* **760 F.3d 708, 718 (7th Cir. 2014).** The undersigned examines the competent evidence of record "in the light reasonably most favorable to the non-moving party," giving the non-movant the

benefit of reasonable, favorable inferences and resolving conflicts in the evidence in the non-movant's favor. *Spaine v. Community Contacts, Inc.,* **756 F.3d 542, 544 (7th Cir. 2014).**

### D. <u>Analysis of Merz's Motion for Summary Judgment</u>

To succeed on a negligence claim under Illinois law, a plaintiff must prove that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injuries. *Furry,* **712 F.3d at 992,** *citing First Springfield Bank & Trust v. Galman,* **720 N.E.2d 1068, 1071 (Ill. 1999).** In this case, Merz takes issue only with the element of proximate cause – the connection between Merz's actions and the August 2015 fire that damaged the Firefly.

To establish proximate cause, the plaintiff bears the burden of affirmatively showing that the defendant's alleged negligence caused the injury or damage for which the plaintiff seeks to recover. *Berke v. Manilow,* **63 N.E.3d 194, 204 (Ill. App. 2016).** Illinois law defines proximate cause as "a cause that, in the ordinary course of events produced the plaintiff's injury," but it "need not be the only or last cause; rather, the combination of multiple causes may result in the injury." *Atchley v. University of Chicago Medical Center,* **64 N.E.3d 781, 794 (Ill. App. 2016).**

Proximate cause is comprised of two distinct requirements -- "cause in fact" and "legal cause." *Id.; Jones v. Live Nation Entertainment, Inc.,* **63 N.E.3d 959, 973-94 (Ill. App. 2016).** In Illinois negligence actions, causation requires proof of *both* cause in fact and legal cause. *Thacker v. UNR Industries, Inc.,* **603 N.E.2d 449, 455 (Ill. 1992).**

Cause in fact exists if a there is a reasonable certainty that the defendant's acts caused the injury (i.e., if "the defendant's conduct was a material and substantial factor in bringing about the claimant's injury"). *Atchley,* **64 N.E.3d at 794***, citing Abrams v. City of Chicago,* **811 N.E.2d 670 (Ill. 2004).** Conduct constitutes a "material and substantial factor" if the injury would not have occurred absent the defendant's conduct. *Id.* Stated another way, courts often use two tests when assessing cause in fact – the substantial-factor test and the traditional but-for test. *Union Planters Bank, N.A. v. Thompson Coburn LLP,* **935 N.E.2d 998, 1021 (Ill. App. 2010).**

In contrast, legal cause looks to whether the injury/damage is one that a reasonable person would consider to be a likely consequence of his conduct or, instead, whether the injury/damage is so highly extraordinary that imposing liability is not justified (although a person need not be able to foresee the precise way the injury would occur or the extent of the injury). *Id., citing Young v. Bryco Arms,* **821 N.E.2d 1078 (Ill. 2004), and** *Hooper v. County of Cook,* **851 N.E.2d 663 (Ill. App. 2006).** Legal cause presents a policy question and exists if the defendant's conduct is closely enough tied to the plaintiff's injury or damage that the defendant should be held legally responsible. *Turcios v. DeBruler Co.,* **32 N.E.3d 1117, 1124 (Ill. 2015).**

The question posed by Merz's motion is this: viewing the facts and reasonable inferences in Midwest's favor, does the record permit a jury to find that Merz's conduct was a material and substantial factor in bringing about the August 2015 fire at the Firefly? If the answer is yes, then Merz's acts or omissions constitute *cause in fact.* And could a reasonable jury find it foreseeable that the fire was a likely consequence of

Merz's actions/inactions?  If that answer is yes, then Merz's conduct constitutes *legal cause*.

Liability "cannot be predicated on speculation, surmise, or conjecture;" the plaintiff "must establish with reasonable certainty" that the defendant's acts or omissions caused the injury or damage.  ***Berke*, 63 N.E.3d at 204*, citing Mann v. Producer's Chemical Co.*, 827 N.E.2d 883, 888 (Ill. App. 2005).**  However, if reasonable minds could differ on whether the defendant's conduct was a substantial factor in bringing about the injury, a dispute of material fact exists, and the question must be decided by the jury.  ***Jones*, 63 N.E.3d at 974, *quoting McKenna v. AlliedBarton Security Services, LLC*, 35 N.E.3d 1007, 1020 (Ill. App. 2015).**

The latter point is significant here.  It is undisputed that the fire resulted from the build-up of creosote and cooking byproducts in the ductwork over the grill and ignited, specifically in the vertical section of the system.  *See* Doc. 28, p. 2; Doc. 32, p. 2; Doc. 39, p. 2.  Merz contends that Midwest has failed to establish with sufficient certainty that Merz's design or installation of the ductwork caused or contributed to the fire.  Midwest has presented enough evidence to get past Merz's summary judgment motion.

First, Midwest's expert, Daniel J. Sovar, Senior Mechanical Engineer with Semke Forensic, has opined that the design of the exhaust system "caused an accumulation of creosote, grease, and other contaminates, since it did not lead directly to the exterior of the building," as required by NFPA 96 (Doc. 32-5, p. 3).  Second, an investigator with the Effingham (Illinois) Fire Department, Chief Joseph Holomy, testified in a deposition taken herein that the exhaust system, as designed, (1) was not code-compliant, and

(2) contributed to the collection of creosote in the ductwork (Doc. 32-7, pp. 2-3; Depo. pp. 30-31). Specifically, Holomy testified (*id.*):

> The one thing that we identified when we did the inspection was that the vertical duct that would go to the roof to take the exhaust out from the kitchen had a number of 90 degree angles and 30 degree angles in there, and the problem with that is it doesn't meet code because every turn, every bank becomes a collection point for grease to set.
>
> The other thing we noted was that the diameter of the ductwork had changed from the point of the kitchen to the rooftop, and instead of getting bigger, it had actually gotten smaller which then creates another restrictive flow for the grease to travel.

Third, both engineer Sovar and Lieutenant Joseph Nieman of the Effingham Fire Department concluded that the 2011 ductwork design had an inadequate number of access panels, rendering sections of the ductwork not reachable for cleaning. *See* Doc. 32-5, p. 1 (failure to incorporate access panels in the ductwork as required by NFPA 96 caused the elbow and vertical sections to be inaccessible for cleaning). *See also* Doc. 32-8, pp. 4-5; depo. pp. 43-44. An additional access panel ultimately was installed (by Rock Solid) on or around August 3, 2015. Some build-up was removed from the ductwork at the time of that installation, and the Firefly's owner was notified that the entire system required the regular full cleaning. That did not happen after the new access panel was installed, essentially leaving in place the build-up that had occurred in the system before the ductwork became more accessible via the new panel.

NFPA 96 requires at least monthly (within 30 days) inspection in commercial kitchen exhaust systems, to detect grease build-up. NFPA 96 makes the facility owner responsible for compliance with this standard. Despite being told the system needed to

be cleaned, the Firefly's owner let more than 30 days pass without cleaning the ductwork and had not scheduled an inspection or cleaning when the August 30, 2015 fire occurred. *See* Doc. 27-2, pp. 8-9; depo. pp. 28-29; Doc. 28, pp. 8-9. Clearly, a reasonable jury could conclude that the *sole* proximate cause of the fire was the Firefly's failure to inspect and clean the ductwork on a timely and code-compliant basis. But a reasonable jury also could conclude that Merz's design of the ductwork was a proximate cause of the fire.

Reasonable minds could differ as to whether the fire would have occurred absent Merz's design/installation of the 2011 ductwork. Reasonable minds could differ as to whether Merz's conduct was a material element and substantial factor in bringing about the fire. A genuine issue of material fact remains as whether Merz's conduct was a proximate cause of the fire, an issue the jury must decide. The Court denies Merz's summary judgment motion.

### E. Analysis of Rock Solid's Summary Judgment Motion

Rock Solid's motion also targets Midwest's proof of proximate cause but presents a much closer call. Midwest's amended complaint alleges that Rock Solid was negligent in seven ways (Doc. 12, pp. 6-7):

(1) improperly cleaning and maintaining the ductwork system;
(2) failing to timely notify the Firefly of any difficulties cleaning the ductwork;
(3) improperly installing adequate access panels to allow proper cleaning;
(4) improperly installing the additional access panel (on August 3, 2015);
(5) failing to comply with known industry standards;
(6) failing to train its employees on proper cleaning of the ductwork; and
(7) failing to adequately supervise the work of its employees to ascertain that the work was performed properly.

Rock Solid's summary judgment motion is directed at the first five of these negligence theories (some of which overlap). The crux of the motion is that Midwest has not produced any evidence that Rock Solid negligently cleaned/maintained the system or negligently installed the additional access panel on the system. Rock Solid also attacks the allegation that it failed to notify Midwest of difficulties cleaning the system.[1] A few additional undisputed facts from the record bear mention at this juncture.

The Firefly experienced two other fires in the grill's exhaust system before the August 2015 fire at issue in this lawsuit. The prior fires were in March 2007 and January 2011. After the January 2011 fire, the Firefly hired Merz to reconfigure and install new ductwork for the exhaust system and hired Rock Solid to clean the ductwork on a periodic basis.

Build-up from solid-fuel cooking can create a serious fire hazard in as little as a week. *See* Shaefer Engineering Report, Doc. 28-3, p. 18, *citing A Guide for Commercial Kitchen Fires, Prevention and Investigation.* It is undisputed that NFPA 96, the code that governs commercial kitchen exhaust systems, requires the owner of any commercial kitchen that burns solid fuel to have its ductwork inspected by a qualified person for grease build-up and/or cleaned every 30 days *and* places the responsibility for compliance on the owner of the facility or system. Midwest's expert, Mr. Sovar,

---

[1] The amended complaint says Rock Solid failed to *timely notify* the Firefly of difficulties in cleaning the ductwork. In the summary judgment briefs, that negligence theory morphs into the allegation that Rock Solid was negligent by failing to give *written* notice of accessibility issues with the duct system, as required by NFPA 96.

testified to this.  He also testified that (assuming usage of the grill did not decrease or stop), the creosote/grease build-up would "exponentially grow" once the 30-day mark passed without cleaning.  *See Sovar Depo.*, pp. 52-53.  It is undisputed that the Firefly breached this standard prior to the subject fire.  33 days had passed at the time the August 30, 2015 fire occurred.  The owner of the Firefly had not even scheduled an inspection/cleaning as of that date, despite the fact that more than 30 days had passed.

And this was not the first time the Firefly failed to comply with the 30-day rule. 60 days had passed when the January 2011 fire occurred.  And in 2015, the inspections/cleanings prior to the fire were February 2, 2015, March 23, 2015, May 18, 2015, and July 28, 2015.  Furthermore, the deposition testimony of Rock Solid's owner, Barry Brown, establishes that Rock Solid advised the Firefly's owner (Campbell) in early August 2015, when installing the extra access panel, that there was "quite a bit" of build-up in the system.  Indeed, Brown alerted Campbell that the ductwork needed to be cleaned "ASAP."  *Depo. of Barry Brown,* quoted at Doc. 28, p. 8 (depo. pp. 55, 80-82). When Brown urged Campbell to get the cleaning scheduled, saying "Hey, we need to get this done," Campbell "just said, ' I will get with you.'"  *Id.*  Campbell never did schedule the cleaning.  The next call Rock Solid received was the day of the fire.

It is agreed that the immediate cause of the August 2015 fire was the ignition of creosote and cooking byproducts built up within the 12-foot vertical portion of the duct system above the grill.[2]

---

[2]     The parties do dispute the precise location *within* the 12′ vertical section of ductwork that the fire originated.  As fire investigator Daniel Whiteside of Pyr-Tech, an expert hired by Midwest, testified in his December 2016 deposition

Midwest's central negligence claim against Rock Solid is that Rock Solid failed to properly clean build-up from the duct system on July 28, 2015. Midwest offers slim evidence to buttress this conclusion. Midwest insists that two standard-of-care experts, engineers Daniel Sovar (of Semke Forensic) and Todd Metzger (of Schaeffer Engineering), "both agree that the inadequacy of the cleaning of the duct work contributed to the fire" (Doc. 35, p. 5). The record is much less definitive than this statement suggests. The Court examines these experts' opinions in turn.

Sovar's report culminates in four conclusions, only one of which references Rock Solid at all, and that only fleetingly mentions *cleaning*: "Rock Solid failed to notify the owner of the Firefly in writing of the inaccessibility of the elbow and vertical section of the cut where the fire started, which resulted it [sic] not being properly cleaned" (Doc. 35-5, p. 3). This same conclusory statement appears at pp. 15-16 of the report: "Rock Solid failed to notify the owner of the Firefly in writing of the inaccessibility of the vertical portion of the duct and elbow which resulted in these areas not being properly cleaned. Creosote, grease, and other contaminates continued to build up in these areas since they were not properly cleaned." This opinion is repeated at page 16 of Sovar's report. There, Sovar summarizes his findings as to Merz's negligent design of the ductwork (failure to incorporate enough access panels, etc.), references testimony of Barry Brown (presumably Brown's testimony that, before addition of the extra access panel, there were sections of the ductwork he could not reach during the cleanings),

---

(Doc. 28-2, depo. pp. 35, 40-42, 53-57), three burn patterns were seen in the duct system: (1) on the filters in the hood immediately over the grill, (2) one foot above the filters, and (3) higher up in the 12'-part, near the first 90-degree bend.

and concludes: "The failure of Rock Solid to proper clean the elbow and vertical section of the duct caused further accumulation of creosote, grease and other contaminates. Rock Solid failed to notify Firefly in writing of the inaccessible areas of the exhaust duct."

Midwest's brief did not flesh out whether the Firefly's owner asked or directed Rock Solid to clean the system while Rock Solid was installing the extra access panel in early August 2015. Rock Solid's brief (Doc. 28, pp. 8-9) quotes Brown's deposition testimony which contradicts Sovar's suggestion that Rock Solid dropped the ball in not cleaning the system when adding the extra access panel. Brown testified in no uncertain terms that when he was finishing that job (the access panel installation), he told Niall Campbell of the Firefly that the system needed to be cleaned "now," "ASAP," and he awaited a call from Campbell to perform the full cleaning. No evidence before the Court indicates that the Firefly had hired Rock Solid to clean at the time of the access panel installation. No evidence suggests that there was a standing order that Rock Solid could show up at the restaurant to clean without being asked to do so. Some of Sovar's conclusions as to Rock Solid's negligence may stand on shaky ground. Campbell's deposition does indicate that sometimes, maybe even "generally," Rock Solid's Brown would "reach out to" Campbell about setting up the cleaning (Doc. 35-7, pp. 12-13).

Todd Metzger, who was retained to give his professional opinions regarding what role, if any, the work performed by *Merz* had in the cause of the fire (Doc. 35-3, p. 3), concluded (*id.*):

The … system … was not adequately maintained and cleaned as required by NFPA 96. As such excessive accumulations of combustible residues such as creosote, grease, oils, and other solid fuel burning cooking operation byproducts were present within the ductwork at the time of the fire. Therefore, the deficient state of cleanliness of the hood would have contributed to the cause of the fire.

This does *not* equate to (nor has Midwest identified any deposition testimony that tenders) a conclusion that Rock Solid's July 28, 2015 cleaning was sub-par in some fashion that contributed to the fire. Without question, a cooking fuel build-up in the system caused the fire. Without question, the fact the system had not been cleaned caused the fire. What Midwest has not plainly flagged for the Court is the evidence that some deficiency in Rock Solid's July 2015 cleaning can be tied to the August 30, 2015 fire. In fact, in his deposition, Metzger downplayed any role Rock Solid had in the fire, focusing on the fact the Firefly let more than 30 days elapse without cleaning the system rather than any shortcoming in Rock Solid's July 2015 cleaning. *See Metzger Depo. Testimony,* p. 71, p. 96, *quoted* in Doc. 40, p. 5.

Moreover, it may be tough for Midwest, at trial, to produce evidence of flaws in Rock Solid's July 2015 cleaning for two reasons. First, the ductwork was partially cleaned right after the fire, prior to inspection by any of the experts.[3] Second, there may be no valid method to calculate the amount of grease that built-up during the 33 days of normal use between the last cleaning and the subject fire (or even pin down the total amount of build-up present at the time the fire ignited).

---

[3]      The Effingham Fire Chief, Joseph Holomy, was able to view the interior of some of the ductwork after the fire and before the cleaning on August 30, 2015. He testified that he did not observe anything suggesting that it was not properly cleaned previously. *See* Doc. 28, pp. 13-14, *quoting Holomy Depo.,* pp. 26-27, 68.

Certified fire investigator Daniel Whiteside admitted that he could not determine which if any areas had not been cleaned properly by Rock Solid, without being able to observe the ductwork before and after a normal cleaning. *Whiteside Depo.*, pp. 64-66. Engineer Sovar testified that he could not quantify the amount of creosote built up in the ductwork prior to the fire. *Sovar Depo.*, pp. 34-35. This would be critical to proving that Rock Solid failed to follow industry standards or otherwise did an inferior job in the July 2015 cleaning.

Rock Solid's expert, Joseph Schuh, explained that there was no way for anyone to offer an opinion about the quality of Rock Solid's July 2015 cleaning (i.e., whether it met industry standards for cleaning ductwork), because the system had been used for 33 days after the cleaning and before the fire. Schuh testified that it would be "difficult, if not impossible, to determine" what amount of creosote may have been left behind during the July 2015 cleaning and "what amount had accumulated after the cleaning was done." Doc. 28, p. 13, *quoting Schuch Depo.*, pp. 78-79.

Plus, on August 30, 2015, immediately after the fire, Campbell hired Rock Solid to come clean right away, to limit the business interruption stemming from the fire and try to get the restaurant open by the following day. Rock Solid cleaned for 15 hours (some of which was work on the exhaust system) before being instructed to stop. The ductwork was partially cleaned after the fire, before any investigation by any of the experts retained herein.

The Seventh Circuit has repeatedly declared that "summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that

would convince a trier of fact to accept its version of events." *Gekas v. Vasiliades,* **814 F.3d 890, 896 (7th Cir. 2016),** *quoting Johnson v. Cambridge Industries, Inc.,* **325 F.3d 892, 901 (7th Cir. 2003).** *Accord Citizen for Appropriate Rural Roads v. Foxx,* **815 F.3d 1068, 1077 (7th Cir. 2016).** The undersigned is hard-pressed to conclude that Midwest has produced sufficient affirmative evidence to prove that Rock Solid negligently cleaned the ductwork on July 28, 2015. Construing all facts and all reasonable inferences in favor of Midwest, the undersigned finds that Midwest has marshalled just enough evidence to raise a genuine issue of material fact as to whether Rock Solid's actions were a proximate cause of the fire. Midwest is reminded that a less generous standard will govern any Rule 50(a) motion at trial.

Midwest also alleges that Rock Solid was negligent by failing to advise the Firefly of problems with accessibility in the ductwork – i.e., that Rock Solid could not reach all areas of the system when cleaning. There is ample evidence that within six months of Merz installing the new ductwork in 2011, the Firefly was aware that the system had access issues, that due to the two 90-degree bends in the system, additional access panels were needed for proper cleaning. Firefly owner Niall Campbell testified that sometime between January and June of 2011, an architect (Cass Calder Smith) advised him (Campbell) that they needed to get additional access panels in the system. Campbell also testified that in June of 2011, someone at Rock Solid told him "we needed to put access panels in so they could get to specific spots" and "to be able to clean better." Doc. 28, pp. 15-17, *quoting Campbell Depo.,* pp. 20-27, 28-30, 46.

Furthermore, at the time of the last cleaning (July 28, 2015), Rock Solid again told the Firefly that Rock Solid could not access portions of the duct work to clean them, due to the design of the ductwork. There is no question that the Firefly had been and was keenly aware of this problem. The testimony of Rock Solid's owner, Barry Brown, confirms that Rock Solid repeatedly told the Firefly's owner ("from the very beginning" of working for them), that the ductwork was difficult to access, and there were parts of the system the cleaners simply could not reach. Doc. 28, *quoting Brown Depo.*, pp. 41-44.

Given this overwhelming evidence that the Firefly was well aware of the access problems with the ductwork, a reasonable jury could not find that Rock Solid's failure to advise the Firefly of an access problem in writing caused or contributed to the fire damage for which Midwest seeks to recover. This allegation of negligence does not survive summary judgment.

Ultimately, the Firefly did have an additional access panel installed by Rock Solid in early August 2015, and that would have facilitated more thorough cleaning. But the Firefly did not have the system cleaned at that point. Midwest has not produced evidence to support the allegation that the extra access panel installed by Rock Solid in any way contributed to or caused the fire. Rock Solid placed an additional access panel in the *horizontal* leg of the ductwork, and the unrefuted evidence is that the fire originated somewhere within the 12-foot *vertical* section of the ductwork. Midwest has not pointed to any expert's report or testimony or other evidence that the new access panel somehow factored into or played a role whatsoever in the fire. And the undisputed evidence is that *when* Rock Solid installed the additional access panel

roughly three weeks before the fire, Rock Solid cautioned the Firefly's owner that a build-up within the system needed cleaning "now" or "ASAP," and the Firefly's owner failed to heed this warning. This allegation of negligence does not survive summary judgment.

As noted above, Midwest's amended complaint directs seven negligence claims against Rock Solid:

(1) improperly cleaning and maintaining the ductwork system;
(2) failing to timely notify the Firefly of any difficulties cleaning the ductwork;
(3) improperly installing adequate access panels to allow proper cleaning;
(4) improperly installing the additional access panel (on August 3, 2015);
(5) failing to comply with known industry standards;
(6) failing to train its employees on proper cleaning of the ductwork; and
(7) failing to adequately supervise the work of its employees to ascertain that the work was performed properly.

Construing all facts and reasonable inferences in Midwest's favor (and cognizant that under Illinois law, the defendant's action or inaction need not be the only or the nearest cause, it just needs to be *a* cause which, in combination with some other cause acting at the same time, caused the plaintiff's injury or damage[4]), the Court finds that reasonable minds could differ as to whether Rock Solid's July 2015 cleaning of the system caused or contributed to the fire. This is a genuine issue of material fact which the jury must decide. So, as to allegation/claim (1), the Court **denies** Rock Solid's motion for summary judgment.

---

[4] *Levy v. Minnesota Life Ins. Co.*, 517 F.3d 519, 524 (7th Cir. 2008), *citing* Illinois Pattern Jury Instructions—Civil, No. 15.01 (2006 ed.).

To the extent allegation/claim (5) is tied to allegation/claim (1), i.e., that Rock Solid failed to comply with industry standards in cleaning or maintaining the system, the Court **denies** Rock Solid's motion for summary judgment.

As to allegations/claims (2) and (4), the Court **grants** Rock Solid's motion for summary judgment. As to allegation/claim (3), the record is devoid of evidence indicating that Rock Solid had any role whatsoever in the design or installation of the 2011 ductwork or any input in the decision as to how many access panels would be incorporated into the system at that time. Nor is there any evidence that Rock Solid was hired to install *more* extra panels than the one it installed in early August 2015. To the extent those are the theories that allegation/claim (3) rests on, it does not survive summary judgment (i.e., the motion is **granted**). The motion did not address allegations/claims (6) and (7), so the motion is **denied** as to those claims.

As to the negligence claims against Rock Solid which survive, the Court emphasizes that they survive just barely. In addition to the evidence linking the fire to Midwest's failure to have the system inspected and cleaned every 30 days, other evidence points away from *both* Rock Solid and Merz. For instance, there is evidence (*see* Metzger report, Doc. 28-3, pp. 3-4, 13) that the Firefly's fire suppression system was impaired—perhaps completely inoperable or turned off—at the time of the August 30, 2015 fire and failed to activate, at a minimum resulting in greater damage than would have been sustained had the industry-required suppression system responded. Nonetheless, some genuine issues of material fact regarding the proximate cause of the fire remain for decision by the jury.

F.     Conclusion

For all these reasons, the Court **DENIES** Merz's motion for summary judgment (Doc. 27) and **GRANTS in part/DENIES in part** Rock Solid's motion for summary judgment (Doc. 28).  The deadline for dispositive motions has elapsed.  Trial is set September 25, 2017, with a final pretrial conference before the undersigned at 1:00 p.m. on September 8, 2017.  Counsel shall submit proposed jury instructions (in paper form, delivered to chambers, following the detailed instructions on the undersigned's web page) no later than 12:00 noon on Friday, September 1, 2017.

Because the settlement conference herein was conducted before the dispositive motions were filed, and those motions now have been resolved, the undersigned believes it worthwhile for the parties to freshly explore a possible settlement.  On or before May 17, 2017, Plaintiff's counsel **SHALL CONTACT** the chambers of the Honorable Donald G. Wilkerson, United States Magistrate Judge, to pursue scheduling a settlement conference to be held *before July 1, 2017*.

IT IS SO ORDERED.

DATED: April 21, 2017

*s/ Michael J. Reagan*
Michael J. Reagan
United States District Judge
